IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

       Plaintiff,                            Criminal No. 14-0110
                                               ELECTRONICALLY FILED

   v.

DIONTAI L. MOORE,

       Defendant.

**Findings of Fact and Conclusions of Law on Motions to Suppress (doc. nos. 24 and 25)**

**I.**      **Introduction**

Pending before this Court is Defendant's Motion to Suppress (doc. no. 24) and Defendant's Amended Motion to Suppress (doc. no. 25). This Court held a hearing thereon and received evidence on August 12, 2014, where Officers Miller and Young testified and Supplemental Exhibits were filed on August 24, 2014. Shortly after the parties filed their respective Proposed Findings of Fact and Conclusions of Law (doc. nos. 31 and 32), Defendant filed a *pro se* motion seeking appointment of new counsel (doc. no. 34), which the Court ultimately granted permitting prior counsel to withdraw on August 28, 2014. New defense counsel was appointed on September 3, 2014 (doc. no. 38), and a Joint Motion to Reopen the Suppression hearing was filed on September 17, 2014 (doc. no. 39). The Court stated in a Text Order of September 18, 2014, that the issues related to the timing of a further hearing would be addressed at the Status Conference of September 23, 2014. A supplemental suppression hearing was held on November 24, 2014, at which Officers Miller and Young again testified (doc. no. 45). For the reasons that follow, this Court will DENY Defendant's Motions to Suppress (doc. nos. 24 and 25).

**II. Findings of Fact**

1. Since 2009, Officer Andrew Miller ("Officer Miller" or "Miller") has been a Zone 5 officer with the City of Pittsburgh Police Department, focused in the East End of Pittsburgh. He works as a plain-clothes officer, and is a part of the Pittsburgh Police SWAT team, a group that receives special training in firearms, search and seizure, and the use of force.

2. Officer Ryan Young ("Officer Young" or "Young") is also a City of Pittsburgh Police Officer who is assigned to Zone 3 and has been employed by the City of Pittsburgh Police Department since 2005. Office Young is also in a plainclothes unit and is a Member of the SWAT team. Officer Young has significant training in defensive tactics and arrests/search warrants, with special training in search and seizure. Training requirements include two (2) days per month of squad training.

3. Homewood is the highest crime neighborhood in the City of Pittsburgh, with burglaries, murders, drug activity, gang related crimes and the like. Officer Miller has specifically responded to numerous such crimes in Homewood.

4. On August 24, 2013, from 11:00 p.m. to 4:00 a.m. on August 25, 2013, Officer Miller was working as a plain-clothes officer in an unmarked police car, and he was partnered with Officer Young, who was the driver of the vehicle. The purpose of the detail was in response to a recent to a surge of shootings in Homewood.

5. Officer Miller was dressed in a Green Battle Dress Uniform (BDU), and was wearing a badge. The t-shirt he wore underneath his jacket had the words "Pittsburgh SWAT."

6. Officer Young was wearing squad pants, with black t-shirt and also with his SWAT shirt underneath, and a badge around his neck.

7. As mentioned above, Officers Miller and Young were driving in an unmarked vehicle.

8. At approximately 12:30 a.m. on August 25, 2013, Officers Miller and Young responded from dispatch a call for "shots fired" at subject location. Doc. No. 45 at 22. Typically these calls come from dispatch originate from a 911 call. In this case, a third party anonymous call stated they heard multiple gun shots from the 7000 block of Monticello Street, in Homewood.

9. Because their vehicle was relatively close to the location, it took the Officers less than a minute to reach the 7200 block of Monticello Street. Officer Young was driving west to east on Monticello Street, approaching the stop sign on North Lang Street, with Officer Miller as a passenger.

10. Defendant was walking across the street in a westerly direction. Defendant was walking towards Monticello Street (and the location of the "shots fired") in a northerly direction crossing over North Lang.

11. Officer Miller and Young's police car turned left onto North Lang Street, as Defendant and a female with whom he was walking crossed in front of him moving left to right. Neither Defendant nor his companion were acting nervous when the Officers encountered them, or making any furtive movements, and it did not appear that they were out of breath.

12. There is a bar in the area (near North Lang) where Defendant was stopped and Officer Miller testified that it would not be uncommon to see someone walking from the bar in the subject area.

13. The headlights of the vehicle or the "peripheral" headlights illuminated Defendant body, and his right hand side. Officer Miller credibly testified that he observed a bulge, which

looked to be the outline of a firearm (Doc. No. 37-1) under Defendant's polo shirt after the police car made the turn.

14. Officer Miller observed through Defendant's polo shirt the outline of the "magazine well" or "grip" (approximately 4 inches long), which Miller described as a tight-fitting, polo shirt, that hung below the belt area of Defendant's jeans. Miller told Young of his observations and Young agreed with Miller. Miller and Young then exited the vehicle.

15. Officer Miller testified that the outline of the grip of the firearm was above Defendant's waistline but not visible because his polo shirt was covering his waistline. The firearm is approximately four (4) inches and width is approximately one to one and a half (1-1 ½) inches. Doc. No. 37-1. Defense Exhibit 1.

16. The testimony established that Defendant was wearing sneakers, shorts and a white polo shirt, and two (2) other shirts underneath. Specifically, Defendant was wearing (on the outside) a white polo shirt that was not tucked in (photographed at D-12 and admitted into evidence with no objection); white cargo shorts (photographed at D-10 and admitted into evidence with no objection); an orange undershirt (photographed at D-9 and admitted into evidence with no objection - - the orange shirt looks red in photograph but actual shirt as viewed in court was orange), that was not tucked in; Defendant was not wearing the hospital pants until after the incident and are not relevant to this issues raised herein (photographed at D-13). Defendant testified that he was also wearing a tank top. The hospital staff discarded the tank top into the garbage because it was torn.

17. Defendant's polo shirt covered his beltline and the firearm. Upon exiting the vehicle, Office Miller, who was approximately two (2) feet away from Defendant, was again able to confirm his observation that he observed a "bulge," through Defendant's polo shirt which

4

he described as consistent with the outline of the firearm. See Doc. No. 37-1 (for picture of firearm). Office Young credibly testified also that he could see a cylindrical shape through Defendant's polo shirt.[1]

18. Upon exiting the vehicle, Miller, who was on the passenger side of the vehicle, first identified himself as Pittsburgh Police and then asked Moore if he heard shots fired. Moore stopped, turned towards Officer Miller and responded affirmatively that he heard shots fired at Bennett and Lang Street., which was approximately five (5) or six (6) blocks away to the south.

19. Officer Young stood behind Officer Miller while Miller verbally engaged Defendant. Officer Young did not speak to Defendant but rather, positioned himself in case Defendant attempted to flee.

20. Again, both Officers Miller and Young testified credibly that they observed a "significant bulge," in a cylindrical shape, and what appeared to be or "possibly" was the outline of a firearm.

21. Officer Miller then inquired, "Hey bro, what's in your waistband," and at the same time, Miller reached out and tried to pat down Defendant's waistband. There began a struggle, which lasted approximately one and a half (1 ½) to three (3) minutes, and Miller ultimately removed the firearm from his waistband and then after a struggle, Defendant dropped the firearm and it landed close to him on the ground.

22. Neither Officer asked Defendant whether he had a permit to carry the firearm, but based upon the experience of the Officers, Defendant did not act in a manner consistent with a "reasonable" person who had a valid permit because in their experience, a person typically announces upon pat-down that he or she has a permit.

---

[1] Defendant's Exhibits D4-D13 represents pictures of the clothes Defendant was wearing on the night in question. Defendant testified credibly to support that assertion when he was called for the limited purpose of identifying the clothing that he was wearing that night.

23. The struggle ended in the middle of North Lang Street. The female companion of Defendant left the scene of the struggle. No one else was on the street during this incident that Officers Miller and Young could see. The Officers never attempted to follow up on the location of the female.

24. Officer Miller then called for backup, and other approximately 7 other officers helped to get Defendant into custody. Officer Young retrieved the firearm near the fence-line. Officer Young packaged the gun and the ammunition with Officer Miller watching.

25. Officers Miller and Young were cross contaminated by pepper spray that was used by a backup Officer while taking Defendant into custody. The Officers were able to see and observe even after the pepper spray. Their ability to see the evidence was not impaired.

26. Defendant was carrying a FEG, which is the name of the pistol – it was Hungarian made. Officer Miller testified that the pistol was approximately 6 inches long, something similar to a Glock, which is carried by Pittsburgh police.

### III. Conclusions of Law

#### A. Summary of Law

An analysis of a search and seizure under the Fourth Amendment to the United States Constitution typically proceeds in three (3) stages. First, the Court inquires whether a Fourth Amendment event, such as a search or a seizure, has occurred. Next, the Court considers whether that search or seizure was reasonable. Finally, if the search or seizure was unreasonable, the Court must then determine whether the circumstances warrant suppression of the evidence. *United States v. Dupree*, 617 F.3d 724, 730 (3d Cir. 2010) (other citations omitted).

While the Fourth Amendment prohibits unreasonable searches and seizures, and searches that are conducted without a warrant are presumptively unreasonable, *United States v. Mathurin*, 561 F.3d 170, 173 (3d Cir. 2009), the landmark case of *Terry v. Ohio* provides an exception to the warrant requirement. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In *Terry*, the Supreme Court of the United States held that police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Id.* at 30-31. *See also, State v. Teamer*, 2014 WL 2979378, *2 (U.S. July 3, 2014)(citing *Terry*, 392 U.S. 21 (other citations omitted)("The Supreme Court has described reasonable suspicion as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' This standard requires 'something more than an 'inchoate and unparticularized suspicion or hunch.''")

Reasonable suspicion is suspicion that is reasonably based on the totality of the facts and circumstances. *United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) (citation omitted). "It is a belief that has been defined as a particularized and objective basis for suspecting the person stopped of criminal activity." *U.S. v. Fox*, 2011 WL 841315 (D. V.I. 2011), *quoting Mathurin*, 561 F.3d 174 (other citations omitted).

In determining whether police had reasonable suspicion sufficient to support a *Terry* stop, the Court must examine "the totality of the circumstances." Relevant factors include, but are not limited to: (1) presence of a suspect in a high crime area; (2) a suspect's presence on a street at a late hour; (3) a suspect's "nervous, evasive behavior" or flight from police; and whether (4) a suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity. *United States v. Brown*, 448 F.3. 239, 251 (3d Cir. 2006) (citing cases). "Though the individual factors giving rise to reasonable suspicion may be innocent in isolation, together they

must serve to eliminate a substantial portion of innocent travelers.'" *Mathurin*, 561 F.3d at 174 (quoting *Karnes v. Skrutski*, 62 F.3d 485, 493 (3d Cir.1995)).

**B.     Application**

With regard to the first question, whether there was a search/seizure, it was not until the Officers put their hands on Defendant that a search/seizure even arguably occurred. Their stopping the police car and asking Defendant a question of whether he heard shots fired did not constitute a search or a seizure because it is a reasonable person would have believed that he was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

However, the Officers credibly testified that they both saw a "bulge," which was consistent with the shape of a firearm, underneath Defendant's polo shirt, from the police car, as they approached Defendant. Once they approached Defendant, they were able to get closer and confirm that the bulge appeared to be a firearm on Defendant's person. In the seconds before Officer Miller touched and upon touching Defendant, the stop moved from a "mere encounter" into a *Terry* stop.

The next question then is whether the search/seizure pursuant to *Terry*, was reasonable. After considering the totality of the circumstances, the following facts provide the requisite level of reasonable suspicion to conduct a valid *Terry* stop: (1) Defendant was in a high crime area; (2) it was late at night; (3) Defendant was walking in close proximity to the location of the call for where shots were fired; (4) the Officers observed a bulge on Defendant's waistband from a distance which they were able to confirm once they got closer to Defendant; and, (5) upon questioning, Defendant did not announce that he was legally carrying a weapon. Defendant accurately argues that the Officers did not observe him acting nervous or engaging in any furtive movements. However, the totality of the other circumstances provided the Officers with the

8

requisite reasonable suspicion to conduct a pat-down pursuant to *Terry*. As the Government emphasizes, and this Court agrees, it is important to note that *Terry* specifically states that the officer need not be *absolutely certain* that the individual is armed. *Terry*, 392 U.S. at 27. Rather, the issue is whether a reasonably prudent person under the circumstances would be warranted in the belief that his safety or that of others was endangered. *Id.* In order to follow Defendant's line of thinking, the Court would have to find that the Officers were not credible in their independent testimony that both observed the bulge from far away that they were able to confirm once they were close to Defendant. The Court finds the Officers' testimony to be credible and consistent with each other, and given that Defendant was not acting suspiciously when the Officers approached him, it would have been unreasonable for them to exit their vehicle with guns drawn until they were able to confirm what they each believed to be a cylindrical shape that looked to be the outline of a gun on Defendant's waistband.[2]

Defendant cites the case of *United States v. Fox*, 2011 WL 841314, in which a Federal Judge in the United States District Court for the Virgin Islands (St. Croix) granted a motion to suppress and found the seizure of Defendant's firearm to be unlawful because the arresting Officers did not have reasonable suspicion to conduct a *Terry* stop. The facts of that case are distinguishable, however, from the present scenario. Defendant in that case was observed walking down a main street which was a high crime area in St. Croix near several bars. He made eye contact with police and then backed away into an archway on the side of the street. Police then approached him and ordered him to take his hand out of his pocket, and after complying, Defendant turned to walk away and put his hand back in his pocket. Police then seized his hand and discovered a firearm in his grip.

---

[2] According to the Government, the actual recovery of the firearm was not done pursuant to a seizure because in order for it to constitute an actual seizure, the individual seized has to have been in the control of police officers and submitted to it. Defendant arguably never "submitted" to the seizure of the firearm.

9

The factual background of the present case is different in following crucial respects: in this case, there was a call for shots fired and Defendant was seen walking within a very close proximity of the location of the alleged shots fired, and most importantly, the Officers both observed a bulge in the form of a cylindrical shape protruding from Defendants waste-band. These facts alone warrant a conclusion by this Court that is different than the conclusion in *United States v. Fox*. In *Fox*, the District Court adeptly emphasized that facts supporting reasonable suspicion must "eliminate a substantial portion of innocent travelers." *Fox*, 2011 WL 841315, *5 (D. V.I. 2011). The facts in this case do precisely that - - Defendant through his actions, his presence at the scene of the "crime," which also was a high crime area, and the observations of the firearm by the Officers, "eliminate a substantial portion of innocent travelers," and do not "cast a net wider than allowed by the Constitution." *Fox*, 2011 WL 841315, *5 (D. V.I. 2011), *quoting and citing Mathurin*, 561 F.3d at 174.

For these reasons, this Court hereby DENIES Defendant's Motions to Suppress (doc. nos. 24 and 25).

**SO ORDERED** this 22nd day of December, 2014.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties